IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

* * * * * * *

UNITED STATES OF AMERICA,                    CR 07-02-H-CCL

      Plaintiff,

                                FINDINGS OF FACT,
-v-                                          CONCLUSIONS OF LAW,
                                ORDER, AND VERDICT
GLENN HELLER,

      Defendant.

* * * * * * *

This case came on for bench trial on June 4, 2007.
Defendant was represented by Michael Donahoe, and the Plaintiff
was represented by Marcia Hurd.  Defendant was tried on an
Indictment charging him in Count I with Receipt of Child
Pornography, in violation of 18 U.S.C. § 2252A(a)(2), and in
Count II with Possession of Child Pornography, in violation of 18
U.S.C. § 2252A(a)(5)(B).  Defendant was permitted to file a post-
trial Motion for Judgment of Acquittal Under Rule 29 Federal
Rules of Criminal Procedure, which is now briefed and ready for
decision.

I.   <u>Defendant's Rule 29 Motion</u>.

Defendant attacks two theories of the government, but the first theory was never advanced by the government.  Defendant claims that the government's first theory is that Defendant "received and/or possessed the child pornography by his hands on direction of [J.W.]."  The government has never espoused such a theory, and this Court finds Defendant's contention in this regard without merit.

Defendant next claims that the government's second theory is that Defendant is guilty merely "because he viewed the child pornography with [J.W.] as part of an ongoing sexual relationship."  Once again, Defendant's contention does not fairly represent the government's theory of its case.  The government argued that Defendant did knowingly receive and possess child pornography, not that Defendant merely viewed it.  The government asserted that the evidence showed that the Defendant sought out and obtained child pornography and saved it, and in the process fulfilled all the elements of knowing receipt and possession.

Defendant cites *United States v. Tucker*, 305 F.3d 1193, 1205

2

(105h Cir. 2002) n.16 ("We offer no opinion on whether the mere viewing of child pornography on the internet would meet the statutory definition of possession.").  The government responds to this argument by citing *United States v. Romm*, 455 F.3d 990, 997-98 (9th Cir. 2006) ("[A] person can receive and possess child pornography without downloading it, if he or she seeks it out and exercises dominion and control over it.  Here we hold Romm exercised dominion and control over the images in his cache by enlarging them on his screen, and saving them there for five minutes before deleting them.").  However, the government has not sought to prove a "mere viewing" case; instead, the government has sought to prove knowing receipt and knowing possession.

Defendant asserts that the government has no proof that the child pornography was downloaded from the Internet after Defendant began his caretaking duties in 2001.  This argument must fail in a Rule 29 context, because the government presented the testimony of J.W., who described downloading child pornography to the two screens hooked up to his computer, allowing both Defendant and J.W. to watch the child pornography movies on separate screens at the same time.  (B.Tr. 51:3-52:12.)

J.W. also testified that he frequently downloaded child pornography and saved it to computer files and CDs, some of which were specifically created for Defendant's use and benefit because they contained Defendant's favorite child pornography movies. (B.Tr. 52:13-18.)

In the Rule 29 context, the government's proof, viewed in the light most favorable to the government, need only be such that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In addition, the physical evidence does support J.W.'s testimony, in that two of the CDs are labeled with Defendant's name. (Gvt. Exhibit 4.) J.W.'s testimony and the physical evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the essential elements of Counts I and II beyond a reasonable doubt. Accordingly, Defendant's Motion for Acquittal must be denied.

II. Suppression Motion.

Also pending before this Court is a suppression motion filed by Defendant and heard and taken under advisement by the Court on

May 25, 2007.[1]  Having reviewed all the evidence, the Court makes the following findings of fact and conclusions of law as to the suppression motion:

     A.   Findings of Fact.

1.   On April 6, 2006, Defendant Glenn Heller was serving a term of probation imposed by the State of Montana for a sex offense against a disabled person (J.W.), who is a ward of the State of Montana.

2.   Defendant Heller was born on February 27, 1957; on April 6, 2006, he was approximately 49 years old.  He has a Bachelor of Science degree in geography, and he taught high school geography, history, and English for several years in Florida.  He served in the military for one year as a chaplain's assistant.  He worked for Spring Meadow Resources from approximately 2001 to 2004 as a caretaker for developmentally disabled persons.  His duties included bathing and other personal care for J.W., running errands, and driving J.W. to doctor appointments.

---

[1]  No suppression hearing transcript has yet been prepared, and the Court has relied herein on its own notes and recollections.  As to the bench trial, however, the Court is able to cite to the court reporter's certified transcript.

5

3.   In 2006, Defendant was suffering from symptoms of an
     undiagnosed illness.  He was being treated for
     uncontrollable movement of his legs (similar to restless leg
     syndrome) and tongue.  Defendant also suffered from shaky
     hands, and he could not write very well or very quickly.
     Defendant was also undergoing out-patient sex-offender
     treatment.

4.   At 11:30 a.m., on April 6, 2006, Defendant was on a Helena,
     Montana, street when Helena Police Officer Bryan Fischer
     stopped his unmarked car to speak with Defendant.

5.   Officer Fischer told Defendant that he was checking on
     Defendant's address for a sex offender registration
     compliance check because he had heard that Defendant had
     changed his address.

6.   Defendant was not in compliance with his obligation to
     maintain a current address on his sex offender registration.

7.   Officer Fischer said he needed Defendant to come to the
     police station soon to update his address on his sex
     offender registration, but Defendant need not do so on that
     day.

8.   Officer Fischer told Defendant that neither he nor
     Defendant's probation officer wanted Defendant to be

arrested.

9.   Officer Fischer told Defendant that he was not under arrest and he would not be arrested when he came to the station.

10.  Defendant Heller had been to the police station before for sex offender registration and/or compliance check.

11.  Defendant Heller immediately agreed to come to the police station in approximately 90 minutes, after an appointment. His appointment was for sex offender treatment.

12.  At approximately 1:00 p.m. Defendant arrived at the police station for the address compliance check with Officer Fischer.

13.  The room utilized by Officer Fischer for this meeting was a small, windowless interrogation room with a table and several chairs.  The door was never shut.  Officer Fischer wore a suit and had no firearm visible; he had registration paperwork at the table with him.

14.  Officer Fischer immediately reminded Defendant that he would not be arrested and that he was not in violation of his conditions.

15.  After Defendant filled out registration compliance paperwork, Officer Fischer told him he was done and free to leave.

16.  This compliance check lasted about 10-15 minutes.

17.  Special Agent Kevin Damuth, Federal Bureau of Investigation, then entered the room and asked Defendant if they could talk.  Agent Damuth was dressed in casual clothing with no firearm visible.

18.  Agent Damuth told Defendant that he wanted to talk to him about child pornography that Defendant might have received while taking care of J.W..

19.  Defendant knew the nature of the offense for which he was under suspicion at the time of the interview with law enforcement on April 6, 2006.  One year earlier, Defendant had been interviewed by different law enforcement officers regarding their suspicion of his involvement with child pornography, and Defendant had denied any involvement with child pornography.

20.  Defendant agreed to talk with Agent Damuth.

21.  Agent Damuth told Defendant Heller numerous times that he did not have to talk, that he was free to go, and that he was not in custody.

22.  In fact, Defendant was free to go, and he did leave the police station at the conclusion of the interview.

23.  Throughout, the atmosphere of the interview was friendly and

cordial on all sides.

24. Defendant Heller never indicated that he did not wish to speak with Agent Damuth or Officer Fischer.

25. Defendant knew that he was not required to make any statement, and he knew that he was free to go.

26. Initially, for about fifteen minutes, Defendant Heller denied that he had had any involvement with child pornography.

27. Agent Damuth told Defendant that new information had just been brought to light.  Agent Damuth showed Defendant a box of CDs that was recently found by J.W. and given to law enforcement.  Officer Fischer told Defendant about some of the statements made by J.W. involving child pornography.

28. Defendant Heller thereupon admitted to Agent Damuth and Officer Fischer that he had received child pornography and viewed it with J.W.

29. Defendant admitted that he used J.W. to access child pornography because he could not have it at home where his wife might find it.

30. Defendant Heller corroborated the statements and allegations of J.W.

31. Defendant Heller stated that child pornography was saved in

files on J.W.'s computer, one of which was titled "glenn's
files."

32.   Defendant Heller stated that both he and J.W. viewed child
pornography together and sometimes simultaneously engaged in
sexual acts.

33.   Defendant Heller described his relationship with J.W. as a
father-figure relationship.  Defendant Heller was a father
figure to J.W.

34.   During his testimony at the suppression hearing, Defendant
admitted that he had felt relieved after discussing with
Agent Damuth and Officer Fischer his involvement with the
child pornography.  Both Agent Damuth and Officer Fischer
also testified that they noticed that Defendant seemed
relieved to have described his involvement with the child
pornography.

35.   The conversation between Defendant Heller and Agent Damuth
and Officer Fischer lasted approximately one hour.

36.   After one hour, Agent Damuth asked Defendant whether he
would be willing to provide a written statement, and
Defendant agreed to do so.

37.   Defendant Heller was provided with paper and told to put his
statement into his own words.

10

38. Defendant Heller's handwriting was so shaky that even Defendant could not read all of his own statement after he had written it.

39. Officer Fischer asked Defendant to read his statement out loud so Officer Fischer could type it on a laptop.

40. Defendant Heller dictated his statement to Officer Fischer, who typed it.

41. After the typed statement was printed, Agent Damuth and Officer Fischer went through the statement line by line with Defendant to make sure that Defendant had said those things and was satisfied with what had been typed.

42. Defendant Heller initialed his approval of each line of the statement.

43. After the statement was typed, initialed, and signed by Defendant, Defendant called on his cell phone for a ride, and he left the police station.

44. Defendant Heller had taken a 7.5 mg. Tylenol with codeine on the morning of April 6, 2006, and this was a relatively small dose.  Defendant Heller did not tell Agent Damuth or Officer Fischer that he had ingested this medication some hours before.  At the suppression hearing, Defendant admitted that this was a low dose.

11

45.  Defendant Heller appeared to Agent Damuth and Officer
     Fischer to be cognitively alert and able.  Agent Damuth and
     Officer Fischer believed Defendant to be competent to make a
     statement.

46.  On May 25, 2007, the date of the suppression hearing,
     Defendant testified that the dose of Tylenol with codeine
     that he had taken on the morning of April 6, 2006, had
     affected his ability to reason, slowed him down, and made
     him sleepy and tired.

47.  The Court finds the Defendant's testimony regarding his
     inability to reason when he was interviewed by law
     enforcement on April 6, 2006, not to be credible.  The Court
     finds that Defendant's reasoning was intact during his
     interview by Agent Damuth and Officer Fischer.  Defendant
     denied any involvement with child pornography until he was
     faced with the box of CDs that he knew contained child
     pornography, and one or more of the CDs bore his name ("XXX
     Glenn").  It is much more probable that Defendant's reason
     told him that his previous blanket denials would no longer
     serve to shield him from suspicion.

48.  The Court finds that at 1:30 p.m. on April 6, 2006,
     Defendant's reason and judgment were not impaired by having

ingested a minimal dose of Tylenol with codeine at least two hours–and probably three to five hours--before.

49. The Court finds that Officer Fischer did not summon Defendant to the police station by means of coercion but by means of a loose directive, in that Defendant was not told to appear that day at the police station for the registration compliance check.

50. The Court finds Defendant's one-hour interview with law enforcement at the police station was brief and the environment not coercive because the door to the room was open, and Defendant was repeatedly told that he was not under arrest and did not have to talk to the officers.

51. The Court finds that law enforcement applied little, if any, pressure to obtain Defendant's presence and willingness to be interviewed.

52. The Court finds that no coercion, physical or psychological, or improper inducement, was used to overbear Defendant's will.

53. The Court finds that a reasonable person in the circumstances of the Defendant on April 6, 2006, would have concluded that he was free to leave the police station.

54. The Court finds that the Defendant was not in custody.

55.   The Court finds that the Defendant's confession was
      voluntary.

      B.   <u>Conclusions of Law</u>.

1.    A confession must be voluntary to be admissible in a
      criminal prosecution brought by the United States.  18
      U.S.C. § 3501(a).

2.    A confession "means any confession of guilt of any criminal
      offense or any self-incriminating statement made or given
      orally or in writing."  18 U.S.C. § 3501(e).

3.    Factors for the Court to consider include "whether such
      defendant knew the nature of the offense with which . . . he
      was suspected," whether or not such defendant . . . knew
      that he was not required to make any statement and that any
      such statement could be used against him," "whether or not
      such defendant had been advised prior to questioning of his
      right to the assistance of counsel," and "whether or not
      such defendant was without the assistance of counsel...."
      18 U.S.C. § 3501(b).

4.    The presence or absence of any one factor is not conclusive
      as to the voluntariness of the confession.  18 U.S.C.
      § 3501.

14

5.   The government bears the burden of proving by a preponderance of the evidence that a confession is voluntary.  *Lego v. Twomey*, 404 U.S. 477 (1972).

6.   An in-custody defendant must be appropriately warned [Mirandized] for his statements to be admissible in court. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

7.   Whether a defendant is in custody depends on whether a reasonable person in the totality of the circumstances would conclude that he could not leave.  *United States v. Beraun-Panez*, 812 F.2d 578, 580, *amended*, 830 F.2d 127 (9th Cir. 1987).

8.   Factors to be considered in determining whether a person is in custody include (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.  *Id.*

9.   In determining custody, the ultimate question is whether there "is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*California v. Beheler*, 463 U.S. 1121 (1983).

10. The language used to summon Defendant was that of a polite, open-ended command.  Defendant was shown some physical evidence in the case, and Defendant was told of the general nature of the alleged offense.  The physical surroundings were a police interrogation room with a table and a few chairs, and the door was left open, suggesting that the Defendant could get up and leave.  The questioning was brief (one hour), and the Defendant admitted his involvement with child pornography after 15 minutes.  No pressure was applied by Agent Damuth to detain the Defendant.

11. Under the totality of the circumstances, the Court determines that a reasonable person would have concluded that he could leave the police station, and therefore the Court decides that Defendant was not in custody and need not have been Mirandized.

12. The Court determines by a preponderance of the evidence that Defendant's confession was voluntary.

13. The Court therefore concludes that Government's Exhibit 2, which is Defendant Heller's handwritten "Voluntary Statement Form," and Government's Exhibit 3, which is the typed statement signed by Defendant Heller, are both admissible at

16

trial.

14.   I detect a feeling and belief on the part of the defense
      that it was unfair and thus illegal for law enforcement to
      hang Defendant by his own tongue.  However, where law
      enforcement officers do not violate defendant's rights, they
      certainly are not prohibited all contact with a suspect.
      This seems to be the simple case of a suspect, not in
      custody and who has previously denied guilt, being
      confronted by the agent with new evidence and asked to
      respond, whereupon the suspect confesses.  That is within
      the permissible scope of effective law enforcement activity.


III. <u>Bench Trial</u>.

      During the bench trial, the Court received testimony, a
stipulation between the parties, and exhibits.[2]  Now, having
reviewed all the evidence, the Court makes the following findings
of fact and conclusions of law as to the bench trial:

---

[2]   The Court admitted Gvt. Exhibits 1 and 4-7 without
objection.  The Court admitted Defendant's Exhibit 500-503
without objection.

A.   <u>Findings of Fact</u>.

1.   The compact disks ("CDs") found in 2006 by J.W. and his
     guardian, Ms. Murphy, that had been packed away in J.W.'s
     storage unit since 2004, contained approximately 96 child
     pornography images, 565 child pornography movies, and 9
     child pornography story or text files.  (B.Tr. 165:16-20.)

2.   Prior to 2004, Defendant Heller directed J.W. to connect
     with web sites on the Internet offering child pornography
     and to download the child pornography to J.W.'s computer
     hard drive.  (*See* Gvt. Ex. 3; B.Tr. 46:13-16 "Q. Okay.
     Where did the movies come from? A. He wanted me to download
     them. Q. He wanted you to download them from where? A. From
     the internet.") (B.Tr. 49:7-25 "Q. When Mr. Heller came to
     take care of you, how did the two of you start either
     getting or looking at or using those kind of movies? Whose
     idea was it? You're pointing.  A. It was Glenn Heller's.")
     (B.Tr. 65:17-66:14 "Q. Okay. Whose idea was it to do that,
     to go on the internet and look for those movies? A. What do
     you mean? Q. Whose idea was it to do that? Was it your idea
     or was it Mr. Heller's idea or both of your idea? A. It was
     Glenn's idea. I knew what he wanted. Q. Did he ever ask you
     to go do that? A. Yeah.  Q. And did he ask you specifically

18

for what kind of movies? A. What? Q. What kind of movies did he specifically ask you to find? A. He liked, he liked young teenagers going on adults. Q. And – A. Kids. Q. I'm sorry, go ahead. A. Kids. Q. Okay. Did he ever tell you not to do that, not to find those movies or that it was wrong? Did he ever say those things to you? A. No.")

3.   Defendant communicated to J.W. a desire to see pornographic movies involving male children and adult men.  (*See* B.Tr. 50:3-12 "Q. And were those pictures or movies of kids and teenagers in some kind of sexual activity? A. Mostly he would like kids going on grown-ups. Q. Kids and grown-ups? A. Yeah. Q. And were they all movies that had something to do with sex? A. Yeah. Q. And were those boys or girls or both? A. Boys.")

4.   Defendant Heller and J.W. often watched these child porn movies as they were being downloaded to J.W.'s computer's hard drive. (See B.Tr. 51:16-21.)

5.   Defendant Heller could not take home any CDs containing child porn because he was afraid his wife might find them. (B.Tr. 54:14-21.)

6.   Defendant Heller directed Defendant to download child porn to a computer file titled "Glenn's Files."  (Gvt. Ex. 3;

B.Tr. 92:21-93:5.)

7.   At Defendant's direction, J.W. copied child pornography
     movies from his computer to CDs, which he labeled "XXX."
     (B.Tr. 52:25; B.Tr. 93:13-17.)

8.   J.W. made an "XXX" CD for Defendant, containing Defendant's
     favorite movies, and J.W. asked Defendant to take the CD
     home, but Defendant could not take it home for fear of his
     wife finding it.  (B.Tr. 54:14-21.)

9.   J.W. made two CDs that specifically referenced Defendant on
     the label of the CD: "Glenn XXX" [QPO77][3] and "Glenn like 4-
     8-04/XXX Daryl XXX" [QPO91].  (Gvt. Exhibit 4.)

10.  For years, Defendant Heller had access to J.W.'s room and
     the CDs and computer containing child pornography for
     approximately twenty hours per week.  (B.Tr. 91:17-20.)

11.  Defendant Heller would lock J.W.'s door so they would not be
     interrupted while viewing child pornography and engaging in
     sexual activity.  (B.Tr. 44:14-46:3.)

12.  In 2002, Frank W. Wiley, M.D., diagnosed J.W. as being
     developmentally disabled and unable to make informed

_____

[3]  "QPO77" is the inventory number for the compact disk
assigned by FBI computer forensic examiner Brian Poole.  It means
Questionable Item Number 77, Pocatello, Idaho, FBI computer
forensics unit.  (B.Tr. 121:19-122:9.)

decisions.  That same year, State District Judge Dorothy
McCarter found that J.W. lacked sufficient understanding or
capacity to make or communicate responsible decisions
regarding his person.  (Gvt. Ex. 1 at 4, ¶¶ 8-9.)

13. Defendant used J.W., an easily manipulated developmentally-
disabled man with cerebral palsy, depression, brain
seizures, and an IQ of 74, to procure child pornography and
to store it for him in a place that was easily and regularly
accessed by Defendant.  (B.Tr. 19:19-23.)

14. Defendant Heller sought out and exercised dominion and
control over the child pornography stored in J.W.'s room.
During the years 2001-2004, Defendant watched child
pornography movies as they were being downloaded from the
Internet.  He watched child pornography movies that had been
previously downloaded from the Internet and then stored on
the computer hard drive.  He watched child pornography
movies that had been previously downloaded from the
Internet, stored on the computer hard drive, and then copied
onto a CD.  He asked J.W. to play his favorite child
pornography movies for him.  Two of the CDs containing child
pornography movies were labeled "XXX Glenn."  (Gvt. Ex. 4.)
One of the files on J.W.'s computer hard drive was titled

"Glenn's Files."  Defendant admitted directing J.W. to download child pornography and save it to the hard drive and to CDs.  (Gvt. Exhibit 3.)  J.W. testified that Defendant wanted the child pornography saved to CDs for future viewing by both Defendant and J.W..  Defendant had access to this and all other child pornography in J.W.'s room for hours, every day, for years, as if it were his own personal viewing library.  Defendant possessed this child pornography.

15.  As a practical matter, it was not necessary for Defendant to be present when J.W. downloaded or copied child pornography. J.W. knew what Defendant liked, and J.W. obtained the child porn and stored it for Defendant's future receipt and possession, which did in fact occur.

16.  For many years, Defendant Heller possessed the child pornography stored on J.W.'s hard drive and on CDs stored in J.W.'s room.  Such possession was joint and nonexclusive.

17.  The Court does not find, and need not find, that either Defendant or J.W. was a leader or a follower.  (*But see* Gvt. Exhibit 3; B.Tr. 114:11-25.)  Both Defendant and J.W. received and possessed child pornography.

18.  J.W. had suffered multiple instances of exploitation in the past, one of which was a sexual abuse by a stranger when he

22

was a teenager; the other instances of exploitation were
separate instances of financial exploitation by two family
members.  In 2001, at the time Defendant arrived in J.W.'s
life as a caretaker, J.W. was approximately 36 years old,
and both of J.W.'s parents were dead.  J.W. loved Defendant
(B.Tr. 55:23-25), called him daddy (B.Tr. 56:12-14),
believed Defendant was a good guy (B.Tr. 56:1-8), and
attempted suicide after Defendant was terminated as his
caretaker (B.Tr. 57:4-11).

19. In 2004, J.W. disclosed the fact of his sexual relationship
with Defendant Heller to his guardian, Larianne Murphy, who
is employed by the Adult Protective Services office of the
Montana Department of Public Health and Human Services.
(B.Tr. 71:4-5.)  J.W. disclosed this information to Ms.
Murphy because he was concerned about the welfare of another
developmentally-disabled person who could not speak and who
was also in Defendant's care.  (B.Tr. 84:6-19.)  J.W. was
also concerned about the welfare of a boy who had reportedly
gone skinny-dipping with Defendant.  (B.Tr. 84:19-85:4.)
J.W. sympathized with those who might be exploited by
Defendant because he had such an encounter with a stranger
as a 13 year old boy, and it made him angry.  (B.Tr. 47:13-

17.)

20. The Court found J.W. to be a credible witness.  J.W. had difficulty testifying against Defendant, and he clearly struggled with his embarrassment and shame, his attachment to and love for the Defendant, and his recognition of Defendant's predatory behavior.  The Court found J.W. to be a credible witness generally, and to be credible specifically as to the issue whether Defendant Heller knowingly received and possessed child pornography beginning in June 2001 and continuing through June 10, 2004, as charged in the Indictment.

21. By stipulation of the parties, the images in question in this case are child pornography in that they are images of children engaged in sexually explicit conduct as defined under federal law.  (Stipulation, Docket #36.)

22. By stipulation of the parties, the images in question in this case are child pornography that has traveled in interstate commerce.  (Stipulation, Docket #36.)

23. Defendant Heller knowingly received numerous visual depictions of minors engaging in sexually explicit conduct by direct downloads from the Internet, in interstate commerce, by means of a computer, and by receipt of CDs and

the images thereon which have been previously downloaded from the Internet and therefore traveled in interstate commerce by means of a computer.

24. Defendant Heller knowingly possessed computer files and CDs that contained images of child pornography that had been transported in interstate or foreign commerce by means of a computer.

25. The Court finds that even without consideration of the confession, there was ample evidence presented in open court during trial from which the Court could find the Defendant guilty of both offenses beyond a reasonable doubt.

B.  <u>Conclusions of Law</u>.

1. It is illegal for a person to "knowingly receive any child pornography that *has been* mailed, or shipped or transported in interstate or foreign commerce by any means, including by computer."  18 U.S.C. § 2252A(a)(2) (emphasis supplied).

2. It is illegal for anyone to "knowingly possess any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that *has been* mailed, or shipped or transported in interstate or foreign commerce by any means, including by

computer."  18 U.S.C. § 2252A(a)(5)(B) (emphasis supplied).

3.   The government need not prove that either the receipt or the possession of child pornography was accompanied by contemporaneous downloads from the Internet by means of a computer.  Rather, the government need only prove that the child pornography had been, *at any time* previous to the receipt or possession, "transported in interstate or foreign commerce by any means, including by computer...."  18 U.S.C. § 2252A(a)(2) and § 2252A(a)(5)(B).

4.   Any property, real or person, used or intended to be used to commit or to promote the commission of child pornography offenses shall be forfeited to the United States.  18 U.S.C. § 2253(a).

5.   To be found guilty of the offense of Receipt of Child Pornography as alleged in Count I of the Indictment, the United States must prove each of the following elements beyond a reasonable doubt:

> First, defendant knowingly received a visual depiction in interstate or foreign commerce by any means, including a computer;
>
> Second, the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;
>
> Third, that such visual depiction was of a minor

engaged in sexually explicit conduct;

Fourth, defendant knew that such visual depiction was of sexually explicit conduct; and

Fifth, defendant knew that at least one of the persons engaged in sexually explicit conduct in such visual depiction was a minor.

6.    To be found guilty of Possession of Child Pornography as charged in Count II of the Indictment, the United States must prove each of the following elements beyond a reasonable doubt:

First, defendant knowingly possessed computer disks or any other material which defendant knew contained visual depictions of minors engaged in sexually explicit conduct;

Second, defendant knew the visual depictions contained in the computer disks or any other material contained minors engaged in sexually explicit conduct;

Third, defendant knew that production of such visual depictions involved use of minors in sexually explicit conduct; and

Fourth, that each visual depiction had been either

(A)   mailed or shipped or transported in interstate or foreign commerce by any means, including by computer, or

(B)   produced using material that had been mailed or shipped or transported in interstate or foreign commerce by any means, including by computer.

7.    A person has possession of something if the person knows of

its presence and has physical control of it, or knows of its
presence and has the power and intention to control it.
More than one person can be in possession of something if
each knows of its presence and has the power and intention
to control it.  9TH CIR. CRIM JURY INSTR. 3.18 (2003).

8.   In order for property to be forfeited pursuant to Count III,
the United States must prove that certain property was used
to facilitate the commission of the offenses in Counts I and
II.

IV.   <u>Order</u>.

IT IS HEREBY ORDERED that Defendant's Motion to Suppress His
Statement is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion for Acquittal
Pursuant to Rule 29 is DENIED.

V.   <u>VERDICT</u>.

A.   The Court finds beyond a reasonable doubt that
Defendant Glenn Heller knowingly received child
pornography as charged in Count I of the Indictment, in
violation of 18 U.S.C. § 2252A(a)(2).

B.   The Court finds beyond a reasonable doubt that

Defendant Glenn Heller knowingly possessed child
pornography as charged in Count II of the Indictment,
as prohibited by 18 U.S.C. § 2252A(a)(5)(B).

C.    The Court finds beyond a reasonable doubt that
Defendant Glenn Heller used the property listed in
Count III, numerous CDs, to commit the child
pornography offenses.

Accordingly, the Court finds the Defendant guilty of Counts
I and II as charged in the Indictment.  The Court finds further
that the Defendant shall forfeit the personal property listed in
the Indictment.  The Court will set down a sentencing date by
subsequent order.

Done and Dated this 17th day of August, 2007.


_____
CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE


29